# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-18-00224-CR

---

**Terrence Roberts, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE COUNTY COURT AT LAW NO. 1 OF COMAL COUNTY
### NO. 2014CR1155, THE HONORABLE RANDAL C. GRAY, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

A jury convicted appellant Terrence Roberts of the class A misdemeanor offense of forgery. *See* Tex. Penal Code § 32.21. The trial court sentenced him to 365 days' confinement and a $3,000 fine but suspended imposition of sentence and placed him on community supervision for twelve months. In one issue, appellant contends that the evidence was insufficient to prove the elements of forgery as pleaded in the information. Because we conclude that the evidence was sufficient, we affirm the judgment of conviction.

### Background

The State's case against appellant arose from an investigation by the Texas Department of Insurance (TDI) concerning a claim made by Scott Raper, who was the president of Central Insurance Agency (CIA). Raper reported to TDI that he had been presented with a copy of a Certificate of Liability Insurance (the Certificate) that purported to have been issued by

CIA. Although it was a "proper certificate form," Raper testified that he did not authorize it, and it had been forged. Following the TDI investigation, the State charged appellant by information, alleging that on or about March 3, 2013, appellant forged the signature of Scott Raper and altered the policy effective and policy expiration dates that were listed on the Certificate without the authorization of CIA, "being represented by Scott Raper."

A copy of the Certificate was admitted as an exhibit at the November 2017 jury trial. It reflects on its face that it was issued on March 3, 2013; that Raper purportedly signed it; that "Terrence Roberts Electric Terrence Roberts DBA" was the insured; that the effective dates of the listed insurance policies were March 3, 2013, to March 3, 2014; and appellant's current address and phone numbers were provided below his name. Raper testified at trial that a certificate of liability is a "snapshot in time as of the day it was produced" of insurance coverage that was in force; that CIA did not issue the Certificate; that Raper did not sign it or authorize the use of his stamped signature; and that appellant previously had "[m]ultiple policies over several years" with CIA but that the last insurance that CIA had provided to him was "over ten years prior."

A certificate of liability insurance that CIA had issued in 2001 and a forgery affidavit from Raper also were admitted as exhibits. Raper attested that he did not sign or authorize another to sign the Certificate and that the signature affixed to the Certificate was not his "genuine signature and [was] a forgery of such." The 2001 certificate reflects an issuance date of August 10, 2001; lists "Roberts, Terrence Electric Terrence Roberts Electric" as the insured and the same address for appellant as the Certificate; but it does not include his phone numbers. During his testimony at trial, Raper compared and pointed out similarities and discrepancies in the two forms. Among the similarities, both included the same policy amounts

2

and listed "Association Casualty Insurance" as an insurer. Raper testified that CIA had not "represented American Casualty for a good 10 to 15 years."

In addition to calling Raper, the State called Sharon Goodman, who was an employee at the corporate office of Rio Resources; Dale Yates, who was the general manager and CEO of Rio Resources; and Robert Parchman, who was the investigator from the TDI fraud unit assigned to investigate the Certificate. The jury heard evidence that appellant was an electrician who was working as a subcontractor for Rio Resources on a project in Midland, Texas, when Yates asked him and the other subcontractor to provide proof of insurance to comply with bank financing requirements; that the only other subcontractor "packed up and left" when asked to provide proof of insurance; that Yates routinely transported documents from the job site in Midland to the office in a folder as the standard practice;[1] and that appellant had given documents to Yates that Yates transported to the office. Specifically as to this case, Goodman testified that Yates delivered a folder from the job site that contained the Certificate along with other documents including appellant's W-9 form. Because the policy period in the Certificate

---

[1] When asked, "What was the means you will get documentation from the field to the corporate office," Goodman answered, "When daily [Yates] would go back and forth, he would bring any invoices, any requested documents." She also confirmed that this was the "normal" practice. Yates testified consistently to this practice of transporting documents from the field to the office and that he had received documents from appellant to transport to the office:

Q. Do you regularly receive documents from contractors out in the field in Midland?
A. Traditionally I do. I transport documents between the field and our office.
Q. And have you ever received documents from the Defendant in this case, [appellant]?
A. Yes.

When asked the "normal method" that he received documents from appellant, he testified that "[s]ometimes [he] would receive paperwork from him that [Yates] would transport to the office in a folder, different statements and things. . . ."

was about to expire, Goodman testified that she notified appellant "multiple times" "via e-mail and phone and left voice messages" that he "would need to submit an updated Certificate of Insurance" and that she e-mailed a copy of the Certificate as an attachment to appellant, but he did not provide an updated certificate. Yates also talked to appellant about the need for a current policy after the stated policy period in the Certificate had expired.

After the policy period in the Certificate expired, Goodman contacted CIA to ask them to forward an updated certificate, but CIA did not have a policy that matched the policy number reflected on the Certificate. Goodman then provided a copy of the Certificate to CIA. After receiving the copy, Raper contacted the TDI to report the forged Certificate. As part of his investigation, Parchman contacted appellant, Raper, Goodman, and Yates. Parchman testified that he identified appellant as the suspect and scheduled a meeting with appellant by phone but did not have further contact with appellant despite numerous attempts to do so, that appellant was the only person who benefited from the Certificate, and that appellant did not provide an explanation to him during the four years that the case was pending. Parchman believed that appellant was avoiding him.

The defense theory was that appellant did not have knowledge of the Certificate and that he provided insurance from a different company other than CIA when Rio Resources asked him to do so. Appellant testified on his own behalf, denying that he had possession of the Certificate or knew of its existence until he was provided with a copy during the case. Although he confirmed that he "put packets together to send back to Midland or they were dropped off at their office and there was [sic] numerous documents in the packet," he denied that he included the Certificate in any packet. He testified that the "first time [he] had ever seen [the Certificate] was when Sharon Goodman sent it to him." He denied that he had created or provided the

4

Certificate to Rio Resources. The evidence was undisputed that no claims were filed on the purported insurance policy reflected in the Certificate and that appellant subsequently provided insurance from another company for the project, but that he worked on the project and received compensation during the time period that the Certificate was on file with Rio Resources and he did not have other insurance. Appellant testified that he eventually left the project because of issues that he had with Goodman.

The jury found appellant guilty of the class A misdemeanor offense of forgery. *See* Tex. Penal Code § 32.21. The trial court sentenced appellant to 365 days' confinement and a $3,000 fine but suspended imposition of sentence and placed him on community supervision for twelve months. The trial court denied appellant's motion for new trial, and this appeal followed.

**Analysis**

**Standard of Review**

Under the legal sufficiency standard of review, we consider the evidence in the light most favorable to the verdict and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). Under this standard, we defer to the jury's resolution of conflicts in testimony, weighing of the evidence, and drawing of reasonable inferences from basic facts to ultimate facts. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *see Nisbett*, 552 S.W.3d at 262 (explaining that standard of sufficiency review "gives full play to the responsibility of the factfinder" and that "court's role on appeal is restricted to guarding against rare occurrence when the factfinder does not act rationally"); *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015) ("The trier of

5

fact is the exclusive judge of the credibility and weight of the evidence and is permitted to draw any reasonable inference from the evidence so long as it is supported by the record.").

We apply the same standard to direct and circumstantial evidence. *Isassi*, 330 S.W.3d at 638. "It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt." *Nisbett*, 552 S.W.3d at 262. "Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Id.* "Furthermore, the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014); *see Kitzmiller v. State*, No. 02-14-00309-CR, 2015 Tex. App. LEXIS 7681, at *8 (Tex. App.—Fort Worth July 23, 2015, no pet.) (mem. op., not designated for publication) ("A juror is not required to check his or her common sense at the door.").

**Sufficiency of Evidence to Support Forgery Conviction**

A person commits the offense of forgery "if he forges a writing with intent to defraud or harm another." *See* Tex. Penal Code § 32.21(b). "Forge," in relevant part, means "to alter, make, complete, execute, or authenticate any writing so that it purports: (i) to be the act of another who did not authorize that act." *Id.* § 32.21(a)(1)(A)(i). To prove the requisite intent to harm or defraud another in a forgery case, "the trier of fact must be able to reasonably infer that Appellant knew the instrument was forged beyond a reasonable doubt." *Ramsey*, 473 S.W.3d at 809; *see Okonkwo v. State*, 398 S.W.3d 689, 695 (Tex. Crim. App. 2013) ("[T]he State

6

necessarily had to prove that [appellant] knew that the bills were forged."). The intent to defraud or harm may be established by circumstantial evidence, *Leroy v. State*, 512 S.W.3d 540, 543 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Williams v. State*, 688 S.W.2d 486, 488 (Tex. Crim. App. 1985)), although the "mere possession, passage, or presentment of a forged instrument does not support an inference of intent to defraud," *id.* (citing *Parks v. State*, 746 S.W.2d 738, 740 (Tex. Crim. App. 1987)).

In his sole issue, appellant argues that the evidence was insufficient to prove that he committed the offense of forgery as pleaded in the information. Appellant concedes that the evidence was sufficient to support a finding that Raper's signature on the Certificate was not authorized but argues that the evidence was insufficient "to prove who placed it on the document" and that there was no evidence that the policy effective and expiration dates on the Certificate had been altered. He further argues that there was no evidence that he altered the Certificate or that he had the intent to defraud or harm. He argues that his "only connection" with the Certificate was that "his name, address and phone number were on the 'header' of the document" and that Goodman—a person with whom he "did not have a good relationship"—"was the only witness who claimed to have received the allegedly forged document from Appellant—but through their boss, Mr. Yates." Goodman testified that she received the Certificate in a folder that Yates delivered from the job site.

Appellant also focuses on the evidence of his continued employment on the project, the insurance that he obtained from another agency in response to Rio Resources' request, and Yates's equivocal testimony as to whether he delivered the Certificate to the office. Yates testified that he had received documents from appellant that he transported to the office and that he "[s]ometimes" looked at the documents that he transported to the office, but that he

7

did not recall if he looked at the Certificate, other than "[nothing] if any, at more than a casual glance." He later testified that he "[did] not recall one way or the other on that—on the [Certificate] transfer," although he "[was] sure" that he transported a W-9 form from appellant. Appellant argues that his continued employment showed that "he was in no danger of losing his job" and "there was no benefit to [him] to forge [the Certificate], especially since he secured a policy from a different agency."

The jury, however, reasonably could have credited the evidence that: (i) Rio Resources required appellant to provide proof of insurance; (ii) appellant admitted to delivering documents to Yates to take to the office, which was the routine practice for transporting documents from the field to the office; (iii) the Certificate was among the documents that Yates delivered to the office; (iv) after Goodman and Yates contacted him about the insurance policy expiring and Goodman sent him a copy of the Certificate, appellant did not disclaim or deny that he had provided the Certificate to Rio Resources;[2] (v) appellant previously had "multiple" policies with CIA but had not had a policy with CIA for over ten years; (vi) the Certificate was a "proper certificate form"; (vii) the Certificate reflects the effective dates of the purported CIA policy to be from March 3, 2013, to March 3, 2014; (viii) appellant received compensation from the project while the Certificate was on file with Rio Resources; and (ix) appellant's compensation from the project was his primary source of income. The jury also had the two forms to compare—the 2001 certificate that showed appellant's previous insurance coverage

---

[2] Yates testified that he discussed the expired insurance policy with appellant and explained to him the need for a current policy:

Q. Did you speak to the Defendant about his policy?
A. Yes, I said they had to have a current policy.
Q. What was his response?
A. He would get me one.

with CIA and his address and the Certificate that contained his current phone numbers in addition to his address.

This evidence supports that appellant had a motive for providing the Certificate to Rio Resources. *See Nisbett*, 552 S.W.3d at 265 ("While motive is not by itself enough to establish guilt of a crime, it is a significant circumstance indicating guilt."); *Russo v. State*, 228 S.W.3d 779, 794 (Tex. App.—Austin 2007, pet. ref'd) (explaining that evidence of motive "is relevant as a circumstance tending to prove guilt"). The jury also could have found significant the evidence of appellant's responses and conduct when asked about the Certificate. According to Yates and Goodman, appellant did not deny the existence of the Certificate or disclaim that he had given it to Rio Resources when they asked him about it, and Parchman testified that appellant avoided him and did not provide an explanation during the four years that the case was pending. *See Rachal v. State*, No. 14-07-00410-CR, 2008 Tex. App. LEXIS 7258, at *14–16 (Tex. App.—Houston [14th Dist.] Sept. 11, 2008, no pet.) (mem. op., not designated for publication) (concluding that defendant's silence in face of incriminating comments was significant because comments were of type that "reasonable person could be expected to deny or refute if untrue"); *see also Elizondo v. State*, No. 14-98-00493-CR, 2000 Tex. App. LEXIS 2058, at *3 (Tex. App.—Houston [14th Dist.] Mar. 30, 2000, pet. ref'd) (not designated for publication) ("To give silence the effect of an admission, the statement must be one which a normal person would be moved to deny if untrue."). Although appellant denied that he had provided the Certificate to Rio Resources during his testimony at trial, the jury was free to disbelieve him. *See Nisbett*, 552 S.W.3d at 262; *Bustamante v. State*, 106 S.W.3d 738, 741 (Tex. Crim. App. 2003) (explaining that it is within jury's discretion to disbelieve witness's "self-serving" testimony).

Although the above-recited evidence does not constitute direct evidence of forgery, viewed in the light most favorable to the verdict, it constitutes circumstantial evidence from which a rational jury could draw reasonable inferences that appellant forged Raper's signature and altered the policy effective and expiration dates on the Certificate with the intent to defraud or harm. *See Ramsey*, 473 S.W.3d at 811 (concluding that defendant's forgery conviction was supported by combined and cumulative force of all evidence); *De La Paz v. State*, 279 S.W.3d 336, 350 n.46 (Tex. Crim. App. 2009) ("While it is hypothetically possible that a case of forgery could be established by direct evidence, such as eyewitness testimony, most cases of forgery rest on circumstantial evidence.").

Appellant argues that "[t]he state of the evidence in this case is like that found in *Johnson v. State*, 425 S.W.3d 516, 521 (Tex. App.—Houston [1st Dist.] 2012, no pet.)." We find that case factually distinguishable. In that case, the appellant, who did not testify at trial, was listed as the payee on a forged money order and cashed it, but there was no evidence of how appellant obtained possession of the money order or about the payor identified on the money order. *Id.* at 518, 522. Our sister court reversed the forgery conviction, concluding that the State failed to present evidence to show that the appellant knew the money order was forged or possessed the intent to defraud or harm. *Id.* at 524. In reaching its conclusion, our sister court explained that the State did not investigate "the existence, identity, or whereabouts of the money order's payor"—"[t]here was no evidence that the payor on the money order did not exist, or testimony from the payor disclaiming a relationship with appellant." *Id.*

In contrast to the facts before our sister court in *Johnson*, the State's evidence in this case included the testimony from Raper, whose signature was forged on the Certificate. The undisputed evidence showed that appellant had "multiple" insurance policies with CIA but that

10

the last insurance CIA had provided to him was "over ten years prior" and that Raper did not have communications with appellant. *See Tucker v. State*, No. 05-06-00746-CR, 2006 Tex. App. LEXIS 10742, at *5–6 (Tex. App.—Dallas Dec. 18, 2006, no pet.) (mem. op., not designated for publication) (concluding that evidence was sufficient to prove that defendant forged check with intent to defraud or harm another; explaining that there was "no plausible legitimate explanation for appellant's possession and presentment of the check"; and listing evidence that check was produced to resemble victim's business checks, appellant's name and address were typed on check, victim always handwrote checks, victim did not know appellant, and victim did not sign or authorize check).[3]

Appellant also argues that the State failed to prove an intent to defraud or harm because "there is no clearly identifiable person toward whom Appellant's purported intent to defraud or harm could have been directed." The State, however, was not required to prove that appellant intended to defraud or harm a specific person. *See Ford v. State*, 282 S.W.3d 256, 263 (Tex. App.—Austin 2009, no pet.) (explaining that "the State had only to prove that appellant

---

[3] We also conclude that the other cases that appellant cites to support his challenge to the sufficiency of the evidence are factually distinguishable or unhelpful to appellant's position. *See, e.g.*, *Burks v. State*, 693 S.W.2d 932, 938 (Tex. Crim. App. 1985) (concluding circumstantial evidence was sufficient to support conviction for forgery by possession); *Williams v. State*, 688 S.W.2d 486, 488–90 (Tex. Crim. App. 1985) (discussing evidence that supported defendant's knowledge that check was forged and concluding that "intent to harm or defraud was proved circumstantially by the testimony of the State's witnesses"); *Solis v. State*, 611 S.W.2d 433, 434 (Tex. Crim. App. 1981) (finding that evidence was insufficient to support conviction for forgery by passing where there was no evidence to show that appellant knew that instrument was forged or that she passed it with intent to defraud or harm); *Pfleging v. State*, 572 S.W.2d 517, 520 (Tex. Crim. App. 1978) (finding that evidence was insufficient to support conviction for forgery because there was no evidence to show defendant's knowledge that check was forged or that check was "passed with intent to defraud or harm"); *Colburn v. State*, 501 S.W.2d 680, 682 (Tex. Crim. App. 1973) (concluding that circumstantial evidence supported that defendant knew that check was forged when he passed it); *Lossman v. State*, 668 S.W.2d 504, 506–07 (Tex. App.—Fort Worth 1984, no pet.) (same).

intended to defraud or harm another," not particular victim). We also observe that the State in this case did not allege a specific person whom appellant intended to defraud or harm, but that appellant "did then and there with intent to defraud or harm another."

We conclude that the combined and cumulative force of all the evidence at trial, viewed in the light most favorable to the jury's conviction, was sufficient to allow a rational jury to find the elements of forgery as pleaded in the information beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Nisbett*, 552 S.W.3d at 262; *Ramsey*, 473 S.W.3d at 811. We overrule appellant's sole issue.

## Conclusion

Having overruled appellant's sole issue, we affirm the trial court's judgment of conviction.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed: October 11, 2019

Do Not Publish